2006 OK CIV APP 15

**Ted DUENSING and Louise Duensing, Plaintiffs/Appellees,**

v.

**STATE FARM FIRE AND CASUALTY COMPANY, Defendant/Appellant.**

**No. 98,668.**

Court of Civil Appeals of Oklahoma, Division No. 1.

Aug. 26, 2005.

Certiorari Denied Nov. 14, 2005.

carrying when he was preparing to board an international flight, was grossly disproportional to the offense.

128 ██ 

Stephen Q. Peters, R. Lynn Thompson, Harris, Gordon, McMahan, Peters & Thompson, P.C., Tulsa, OK, for Plaintiffs/Appellees.

William R. Cathcart, Virginia Cathcart Holleman, Cathcart & Dooley, Oklahoma City, OK, for Defendant/Appellant.

## OPINION

ADAMS, Presiding Judge.

¶1 Ted Duensing and his wife, Louise Duensing, (collectively Insureds) sued State Farm Fire and Casualty Company (Insurer) for breach of the parties' insurance contract, its duty of good faith and fair dealing (bad faith) and punitive damages. After a jury trial, verdicts were returned in favor of the Insureds, awarding them $24,160.13 for breach of contract damages, $175,000 for bad faith, and $300,000 in punitive damages. Insurer appeals the trial court's judgment, based on the jury's verdicts, which included an award of Insureds' attorney fees and costs and pre- and post-judgment interest on their contractual and non-contractual claims.

¶2 Insurer alleges the trial court "erred as a matter of law by submitting to the jury" Insureds' claims for breach of contract, bad faith, and punitive damages. Insurer's fourth proposition alleges error in the trial court's award of prejudgment interest on the jury's bad faith award, arguing only that if we reverse the judgment for the bad faith claim, this award must also be reversed.

¶3 Denial of Insurer's motion for directed verdict requires a *de novo* or non-deferential review, *see Computer Publica-*

*tions, Inc. v. Welton,* 2002 OK 50, 49 P.3d 732. In ruling on such a request, this court, like the trial court, regards as true all evidence that is favorable to the opponent of the motion together with all reasonable inferences to be drawn from it and disregards conflicting evidence favorable to the moving party. *Harder v. F.C. Clinton, Inc.,* 1997 OK 137, 948 P.2d 298. In reviewing the trial court's decision, we must examine the record and make a determination whether there is any evidence reasonably tending to support the judgment. *Thomason v. Pilger,* 2005 OK 10, 112 P.3d 1162. We have applied these principles in the description of the following facts.

## FACTS

¶4 Insureds have lived in their home for 26 years, and, since 1989, have renewed their homeowners policy with Insurer on an annual basis. On or about June 2, 1998, Insureds thought they could hear water running and while checking out the source, discovered a warm spot on their kitchen floor. After Mr. Duensing remembered running out of hot water during his shower the night before, he checked the water meter, turned off the water to the hot water heater, and concluded they must have a leak in a hot water pipe under the slab of their home. The next day, Insureds called the office of their local agent, Mark Webber, seeking a recommendation for a plumber who could determine where the leak was without tearing up the entire kitchen floor. Webber was unavailable and his office personnel did not know of anyone, however, believing Insureds were calling in a claim for the leak, submitted the information to Insurer's main office. That same day, Fred Harris, a claims specialist for Insurer, telephoned Insureds, asking Mrs. Duensing whether they had received any water damage to their house. When she stated she did not know yet because Leak Locators could not come until Monday morning, Mr. Harris explained that without any water damage to the inside of their house, there was no coverage under their policy. Mrs. Duensing gave Mr. Harris permission to come to their house before Leak Locator would arrive, although

she thought he should wait to see what Leak Locators found.

¶ 5 On June 5, 1998, Mr. Harris arrived about 15 minutes before Leak Locators. He visited briefly with Insureds, took two pictures of the kitchen area and one of the front of the house, and explained to Insureds that because they had no damage to the inside of their house, their policy did not cover the leaking pipe or the costs of tearing out the floor to repair the leaking pipe. Upset with Mr. Harris' denial of coverage and not liking his attitude, Insureds escorted him out of their house. Upon leaving, Mr. Harris called the local agent to explain what had happened, learned that Mrs. Duensing had already called to complain, and as a result, asked the local agent to follow up on Insureds' claim. Sometime after Mr. Harris left, Leak Locators discovered a leaking pipe with a pinhole size hole in it. Because Mr. Harris' visit made it clear there would be no coverage, Insureds did not file a claim with Insurers.

¶ 6 Having had no communications with either the local agent or Insureds since June 5th, Mr. Harris wrote Insureds a letter dated June 9, 1998, explaining that during their meeting he had "made an inspection of the [kitchen] area, and did not find any water *inside the home* from that possible leak" and that the policy could "only extend coverage for the cost of tearing out and replacing the slab and flooring *if there is first a covered loss from the water.* The cost to repair the pipe *is not a covered loss, as plumbing normally breaks because of corrosion, rust, normal wear, or a latent defect.*" (Emphasis added.) Mr. Harris then quoted two separate exclusions from Insureds' policy upon which he was relying for denial of their claim that address the causes emphasized above and one exclusion the parties refer to as the "continuous leakage exclusion."[1]

¶ 7 A few months later, Insureds noticed that cracks had developed on several walls in their house and that the slab was settling in places. They hired an architect, Bob Hale, who investigated the premises and eventually submitted to Insureds a "Structural Report," concluding that "in our opinion, the settlement of the floor was directly caused by the plumbing leak that occurred in the kitchen in June, 1998. We also feel that the movement of the south wall in the dining room and kitchen is a result of the moisture on the exterior foundation." Insureds called their local agent's office on February 22, 1999, wanting to file a claim for the new damage but asking for someone other than Mr. Harris to do the inspection, and were told they would check with the adjuster to see if their file could be "reopened." That same day, William Steuernagel, a claims teams manager for Insurer, returned Insureds' call and left a message, which Mr. Duensing returned the next day, reporting "cracks in the walls and settling" and agreeing to meet with Mr. Steuernagel at Insureds' home to review their claim.

¶ 8 On February 25, 1999, Mr. Steuernagel inspected Insurers' home, during which time he found cracks "in the living room, family room, kitchen, and laundry walls and ceilings" and "in an upstairs bedroom and exterior area outside the kitchen" and that "the floor area in the kitchen had dropped in several areas." Thereafter, Mr. Steuernagel "sat down with insured and explained lack of coverage due to settling" and "tried to explain the policy" to Mr. Duensing, who thereafter told him "it wasn't settling, it was water damage." The next day, Mr. Steuernagel wrote Insureds a denial letter, detailing the June 2, 1998 Loss, his findings on February 25, 1999, and his explanation that same day "that there [is] no coverage for the settling." As "the basis of this denial," Mr. Steuernagel set out in the letter the same three exclusions Mr. Harris relied upon, with the addi-

---

1. The three provisions, none of which are raised by Insurer on appeal, provide, in pertinent part:
 f. continuous or repeated seepage or leakage of water or steam from a: ... (3) plumbing system, ... which occurs over a period of time. If a loss to covered property is caused by water or steam not otherwise excluded, we will cover the cost of tearing out and replacing any part of the building necessary to repair the system or appliance from which the water or steam escaped;
 g. Wear, tear, scratching, marring, deterioration, inherent vice, latent defect or mechanical breakdown;
 h. Corrosion, electrolysis or rust;

tion of two more that address "settling" of the residence and "earth movement."

¶ 9 After a written complaint to the Oklahoma Insurance Commissioner and numerous letters between their attorney and Mr. Steuernagel did not change Insurer's denial of Insureds' claim, they filed this action against Insurer on June 23, 1999. The matter was ultimately tried to a jury, during which two days Insureds' counsel called Insurer's agents, Mr. Harris and Mr. Steuernagel, and Insureds, as witnesses, and admitted numerous exhibits, including the policy, and Insurer's claim and photo files.

¶ 10 After Insureds rested, Insurer moved for a directed verdict, which the trial court denied. Insurer rested, without calling any witnesses, and the case was submitted to the jury, whose verdicts in favor of Insureds [2] are the basis of the trial court's judgment from which Insurer filed its appeal.

## ANALYSIS

### Breach of Insurance Contract

¶ 11 Insurer first alleges that the trial court erred as a matter of law by submitting to the jury Insureds' breach of contract claim, arguing their losses under the policy are excluded from coverage by two separate provisions of the "Section 1—Losses Not Insured" section—the "settlement exclusion" and the "earth movement exclusion."

### The Policy

¶ 12 Under Section 1—Losses Insured, the first paragraph, entitled "**COVERAGE A— DWELLING,**" [3] provides that "[w]e insure for accidental direct physical loss to the property described in Coverage A, except as provided in **SECTION 1—LOSSES NOT**

**INSURED.**" (Emphasis in original.) The Losses Not Insured section has two separate paragraphs for the exclusions for insurance coverage that are at issue for the Coverage A property in this case, Insureds' residence. The first paragraph of the Losses Not Insured section provides, in relevant part:

1. We do not insure for any loss to the property described in Coverage A which consists of, or is directly and immediately caused by, one or more perils listed in items a. through n. below, regardless of whether the loss occurs suddenly or gradually, involves isolated or widespread damage, arises from natural or external forces, or occurs as a result of any combination of these:

 * * * * * *

 l. settling, cracking, shrinking ... of pavements, patios, foundations, walls, floors, roofs or ceilings;

The parties refer to subsection ($l$) as the "settling exclusion."

¶ 13 The second paragraph of the Losses Not Insured section provides, in relevant part:

2. We do not insure under any coverage for any loss which would not have occurred in the absence of one or more of the following excluded events. We do not insure for such loss regardless of: (a) the cause of the excluded event; or (b) other causes of the loss; or (c) whether other causes acted concurrently or in any sequence with the excluded event to produce the loss; or (d) whether the event occurs suddenly or gradually, involves isolated or widespread damage, arises from natural or external forces, or occurs as a result of any combination of these:

---

2. There were two separate verdict forms in this case, the first in which the jury found in favor of the Insureds on their breach of contract and their bad faith claim and then specifically found "by clear and convincing evidence" that Insurer (1) recklessly disregarded its duty to deal fairly and act in good faith with its insureds *and* (2) intentionally and with malice breached its duty to deal fairly and act in good faith with its insureds. In the "Verdict Form—Second Stage," the jury also found in favor of Insureds and awarded punitive damages in the amount of $300,000.

3. "**COVERAGE A—DWELLING,**" as defined under "**SECTION 1—COVERAGES,**" means the "dwelling used principally as a private residence on the **residence premises** shown in the **Declarations,**" which includes, in relevant part, the "foundation, floor slab and footings supporting the dwelling" and the "wall-to-wall carpeting attached to the dwelling." (Emphasis in original.)

\* \* \* \* \* \*

b. **Earth movement,** meaning the sinking, rising, shifting, expanding or contracting of the earth, all whether combined with water or not. Earth movement includes but is not limited to earthquake, landslide, mud flow, mudslide, sinkhole, subsidence, erosion or movement resulting from improper compaction, site selection or any other external forces. Earth movement also includes volcanic explosion or lava flow, except as specifically provided in **SECTION I—ADDITIONAL COVERAGES, Volcanic Action.** (Emphasis in original.)

The parties refer to paragraph 2 alone as the "lead-in clause" and section (b) as the "earth movement exclusion."

¶ 14 Addressing paragraph 2 of the Losses Not Insured as a whole, Insurer argues its unambiguous policy language excludes "coverage for damage which would not have occurred in the absence of earth movement" and "regardless of the cause of the earth movement and regardless of any other cause contributing to the loss," and therefore it was error "to fail to direct a verdict in favor of Insurer" and "to submit the interpretation of the policy to the jury." Insurer further argues that "[t]he evidence presented at trial uniformly demonstrated (1) that settling of the slab floor was caused by the erosion of fill materials from beneath the slab and (2) that the settling of the foundation on the south side of the house was due to earth movement caused by the effects of the moisture on the expansive soil indigenous to the region," both of which "types of earth movement . . . are explicitly identified in the earth movement exclusion." Insurer lastly argues the trial court erred in its application of the earth movement exclusion, claiming "there is no reasoned basis for distinguishing the erosion of fill material from the erosion or shifting of earth," "there was no evidence there

actually had been 'sand fill' under Insureds' house," and "sand is just one type of earth, as are gravel and soil."

¶ 15 Insureds disagree, arguing, in part,[4] that the earth movement exclusion is ambiguous and that unlike the out-of-state cases cited by Insurer, Oklahoma recognizes the efficient proximate cause doctrine, the application of which they argue would allow coverage in this case because "the unrefuted evidence at trial was that the efficient proximate cause of all the damage was the original· plumbing leak." Because Insureds' argument, if correct, would eliminate application of the earth movement exclusion, we address it first.

■ ¶ 16 The efficient proximate cause doctrine, last recognized by the Court in *Shirey v. Tri–State Ins. Co.,* 1954 OK 214, ¶ 0, 274 P.2d 386, applies "in determining the cause of a loss for the purpose of fixing insurance liability when *concurring* causes of the damage appear, the proximate cause is the dominant or efficient one that sets the other causes in operation; incidental causes are not proximate though they may be nearer in time and place to the loss." (Emphasis added.) *If the insured successfully demonstrates that the proximate cause of the loss is covered under the policy,* the entire loss is covered notwithstanding the fact that an event in the chain of causation was specifically excluded from coverage. *See Kelly v. Farmers Insurance Company, Inc.,* 281 F.Supp.2d 1290.

¶ 17 Insurer's response is that the parties contracted out of the efficient proximate cause doctrine, relying on the "lead-in clause"[5] immediately preceding that exclusion, which provides, in pertinent part, "[w]e do not insure for such loss *regardless of:* (a) *the cause* of the excluded event; or (b) *other causes* of the loss; or (c) *whether other causes acted concurrently or in any sequence* with the excluded event to produce

---

**4.** We say "in part" because Insureds argue that "the policy clearly states that damage to the premises, including the slab, is a covered loss if caused by a sudden discharge of water." Their footnote to that statement, however, cites to "Section 1—Losses Insured, ¶ 12 (p. 8 of policy)," which we note applies to "Coverage B—

Personal Property," not "Coverage A—Dwelling," as is involved herein.

**5.** This clause also has been termed the "anticoncurrent cause provision." *See Kelly v. Farmers Insurance Company, Inc.,* 281 F.Supp.2d 1290.

the loss." (Emphasis added.) It further argues the parties of an insurance policy are free to agree that the proximate cause rule will not apply to their contract, relying on the *Shirey* Court's quote of an earlier Oklahoma case that had applied the "proximate cause" rule, *Pennsylvania Fire Ins. Co. v. Sikes*, 1946 OK 142, 168 P.2d 1016, "in the absence of a clear showing that the contracting parties intended to exclude such damage which might be expected to follow as the result of the [proximate cause]." *Shirey*, 1954 OK 214, ¶ 9, 274 P.2d at 388.

■ ¶ 18 Oklahoma law governing insurance coverage disputes is well-established. The foremost principle is that an insurance policy is a contract. Parties are at liberty to contract for insurance to cover such risks as they see fit and they are bound by terms of the contract. It necessarily follows that courts are not at liberty to rewrite the terms of an insurance contract. The interpretation of the policy, with its exclusions, is a law question, unless the facts necessary to apply the decided law question are in dispute. *Wiley v. Travelers Insurance Company*, 1974 OK 147, 534 P.2d 1293.

■ ¶ 19 When addressing a dispute concerning the language of an insurance policy, our first step is to determine as a matter of law whether the policy language at issue is ambiguous. *Wynn v. Avemco Ins. Co.*, 1998 OK 75, 963 P.2d 572. If it is not ambiguous, we accept the language in its plain, ordinary and popular sense. *McDonald v. Schreiner*, 2001 OK 58, 28 P.3d 574. We must construe the policy to give a reasonable effect to all of its provisions, see *Cranfill v. Aetna Life Ins. Co.*, 2002 OK 26, 49 P.3d 703, construing liberally words of inclusion in favor of the insured and construing strictly words of exclusion against the insurer, see *McDonald v. Schreiner*, 2001 OK 58, 28 P.3d 574.

■ ¶ 20 Because insurance contracts are contracts of adhesion due to the unequal bargaining positions of the parties, the Court in *Max True Plastering Co. v. U.S. Fidelity and Guaranty Co.*, 1996 OK 28, 912 P.2d 861, adopted the reasonable expectations doctrine and held that it may apply as a tool to aid the courts in discerning the intention of the parties when the policy language is ambiguous *or* exclusions in the policy are masked by technical or obscure language *or* hidden in a policy's provisions. Under this doctrine, when construing an ambiguity or uncertainty in an insurance policy, the meaning of the language is not what the drafter intended it to mean, but what a reasonable person in the position of the insured would have understood it to mean. *American Economy Insurance Company v. Bogdahn*, 2004 OK 9, 89 P.3d 1051.

■ ¶ 21 After a careful review of the policy and consideration of *Max True Plastering Co.*, we conclude that the language of the lead-in clause to the earth movement exclusion is unambiguous. The only fair construction of that paragraph is that when more than one cause is involved in a loss which includes one of the excluded events named under the lead-in clause, in this case, earth movement, there is no coverage regardless of whether the causes acted concurrently or in any sequence with the excluded event. Further, like the exclusion in *Spears v. Shelter Mutual Insurance Company*, 2003 OK 66, 73 P.3d 865, the lead-in clause of the earth movement exclusion is neither masked by technical or obscure language nor hidden in the policy. Accordingly, we conclude that the reasonable expectations doctrine is not applicable to the lead-in clause of paragraph 2 of the Losses Not Insured section. We further conclude that the same clause clearly and unambiguously avoids application of the efficient proximate cause doctrine and that Insureds' argument relying thereon must fail. We next address the earth movement exclusion to determine the applicability of the reasonable expectations doctrine.

■ ¶ 22 The basis for the trial court's denial of Insurer's motion for directed verdict was:

I agree with the Plaintiffs that, at least, arguably, the sand fill is part of the material used to construct the house. The testimony was that it was to insulate the slab from the movement of the earth, and I think, at least, arguably, that would remove it from [the earth movement exclusion] of the section captioned losses not insured.

As identified by the trial court and Insurer's appellate argument, the issue is whether the erosion of the "sand fill" constitutes "earth" as that term is used in the policy's earth movement exclusion.

¶ 23 We first note that the term "earth" is not specifically defined under the policy and it is not used anywhere else in the policy. When construing a life insurance policy lacking any definition of "accident," the Court in *Cranfill v. Aetna Life Ins. Co.*, 2002 OK 26, ¶ 7–8, 49 P.3d 703, 706, instructs:

> The absence of an express definition of a word within the policy does not necessarily render the word ambiguous. Similarly, the fact that a word cannot be precisely defined to make clear its application in every factual situation does not mean the word is ambiguous. Rather, the test to be applied in determining whether a word is ambiguous is whether the word 'is susceptible to two interpretations' on its face. This test for ambiguity is applied from the standpoint of a reasonably prudent lay person, not from that of a lawyer. In our view, the word accident is not, on its face, susceptible to two interpretations. A reasonably prudent lay person applying for accidental death insurance would understand what an accident is. (Citations omitted.)

¶ 24 Unlike the word "accident," we conclude "earth" *is* susceptible to multiple interpretations, *i.e.*, a reasonably prudent lay person applying for casualty insurance might interpret "earth" to mean "the planet upon which we live," "soil for cultivating," "fragmental material composing part of the surface of the globe: soil, ground, usually distinguished from bedrock" or "areas of land uncovered by water," "the solid footing formed of earth" or "the solid materials that make up the physical globe." *See Webster's Third New International Dictionary* (1961).

In the same dictionary, "earth movement" is defined as "differential movement of the earth's crust" or "elevation or subsidence of the land." As defined by the *American Heritage Dictionary* (1986), "earth" means "the planet upon which human beings live, the third planet from the sun," "the land surface of the world" or "soil; dirt." The definition of "earth" in *Black's Law Dictionary* (6th Ed.) is "soil of all kinds, including gravel, clay, loam, and the like, in distinction from the firm rock." Considering the above definitions, the term "earth" is quite broad because it could either refer to the natural crust or solid surface of the earth (*terra firma*) or the multitude of materials that compose the earth's soil.

¶ 25 However, all of the examples of earth movement in the exclusion clearly refer to various types of movements of the solid surface of the earth. The cases Insurer cites as holding the earth movement exclusion language is unambiguous and "virtually indistinguishable" from those in this case, in fact, involve water leaks washing out or away from beneath the home, the foundation, slab, footer or other structures "soil," "solid earth," or "ground," which terms clearly suggest the type of earth needed to support such structures—earth's solid surface. In this case, however, there is no evidence that the soil or ground supporting the slab was *washed out or eroded* by the leak in this case.

¶ 26 Further, none of the cases cited by Insurer for its third argument, *i.e.*, no reasoned basis for distinguishing the erosion of fill material from the erosion or shifting of earth, involved a "floating slab."[6] Unlike those cases, the jury in this case heard undisputed testimony from Bob Hale, the licensed architect hired by Insureds, explaining that (1) Insureds' house was constructed on a "floating slab" which "is a slab that is in no way connected to the stem wall or the foundation. It is left where it can float. It may

---

6. In *Rhoden v. State Farm Fire and Casualty Company*, 32 F.Supp.2d 907 (S.D.Miss.1998), *affirmed by* 200 F.3d 815 (5th Cir.(Miss.),1999), "testing at various depths at the residence," described as a "slab-on-the-ground," found that *"subsurface soils* encountered within the exploration depths of borings made for the investigation included fill materials and natural silty clays." (Emphasis added.) In *Toumayan v. State Farm General Insurance Co.*, 970 S.W.2d 822 (Mo.App. E.D.1998), water from a broken lateral sewer line leading out from the residence to the rear of the property caused the insured's patio and retaining wall to subside and essentially move toward the house. The earth that moved the retaining wall and patio included "various levels of fill which appeared to be the result of previous attempts at repair or remediation."

settle, it may rise a little bit . . . it is left loose for that reason," (2) the purpose of a floating slab is "trying to eliminate cracks in the slab," (3) the fill used "to accommodate the void between the *natural ground* and [the] four inch slab" is mostly "sand fill," (4) traditionally 12–16 inches of sand fill is used, and (5) "there's at least 10 inches of sand fill underneath this slab." (Emphasis added.) Hale further opined that "it was basically the fill being washed out by the leak that caused the slab to settle" and that "the structural damage that we found that was severe was the slab."

¶ 27 Further, during cross-examination, when asked what kind of soil is below the concrete slab, Hale said, "I don't know that there's ever [been] a test but the general region is clay." After Hale agreed there also had not been a test "of what was actually under the house," he was asked, "So you have no idea whether there was sand under the house or not?" to which he responded, "I haven't seen a house where there wasn't sand fill, unless it was gravel fill."

■ ¶ 28 The jury also heard Mr. Hale's testimony during cross-examination:

Q At any rate, if I understand what you—the bottom line of your testimony is, that necessitated all of these repairs, is you had two things: First of all, you had water that escaped that caused swelling of the earth, and caused cracking on the south side?

A I wouldn't—I wouldn't call that a—that much of a problem since the rest of the slab did not go down. If it had been the heaving totally, the rest of the slab would have been affected, too, but it was basically the fill being washed out by the leak that caused the slab to settle.

Mr. Hale later clarified that the movement of the south wall was not from the "heaving" of the clay soil,[7] and although he agreed on cross-examination that "the south side had

settled slightly," he disagreed that such settlement was caused from the clay getting wet, swelling and shrinking or from consolidation of the fill. He further explained that the "south wall was—was—to be honest, an afterthought because I really didn't see— figure the south wall as that much of a problem," and that the south wall "was a different situation than what the slab was. The slab was a devastating problem." Considering all of the testimony outlined above, in the light most favorable to Insureds, reasonable persons could differ whether the earth movement exclusion applied to Insureds' loss. Because the facts necessary to apply the earth movement exclusion were in dispute, the trial court did not err in denying Insurer's motion for directed verdict on that issue.

■ ¶ 29 Concerning the settling exclusion, Insurer argues that it applies as a matter of law, without regard to the *cause* of the loss, because the exclusion also applies to damage "consisting of" settling and cracking.[8] It further argues that the evidence at trial showed the damage to Insureds' home consisted solely of settling of the floor slab and south wall foundation, cracking of walls which occurred due to the settling, and that Insureds' home had a prior history of settling.

¶ 30 Insureds contend "Insurer's argument ignores the efficient proximate cause doctrine." Agreeing that the policy does not cover losses as a result of *normal* settling, Insureds basically argue their loss does not consist of normal settling because it is a direct result of the sudden accidental discharge of water and that applying the doctrine, there is no loss which is directly caused by settling and the loss was caused by the initial covered peril.

¶ 31 The "consisting of" language upon which Insurer relies is found in paragraph 1 of the Losses Not Insured section, a "lead-in

---

7. To the extent Mr. Hale's testimony may be viewed as conflicting or inconsistent with his prior testimony, *i.e.,* "I feel that the—the moisture from the leak caused the clay to expand and contract under the footing, also," the credibility of this witness and the weight and value of such testimony on the issue of earth movement were

questions exclusively for the jury to pass upon. *Nealis v. Baird,* 1999 OK 98, 996 P.2d 438.

8. Although an issue at trial, the "continuous or repeated seepage or leakage of water" exclusion under paragraph 1 of the Losses Not Insured section is not addressed by Insurer.

clause" to the settling exclusion. As a separate exclusion, we first determine if the efficient proximate cause doctrine applies to the settling exclusion with its lead-in clause.

¶ 32 Insurer's "consisting of" argument is identical to that made by the insurer in a mold coverage dispute in *Kelly v. Farmers Insurance Company, Inc.*, 281 F.Supp.2d 1290. There the Court *disagreed* that the policy language "consisting of" was unambiguous, because "consisting of" implied mold was a *loss* in and of itself, and the policy explicitly identified mold as a "peril," which the Court defined as "the cause of a loss to person and property." 281 F.Supp.2d at 1298. The *Kelly* Court further held that in order to contract around the doctrine, the policy provision intended to effect the circumvention must explicitly and specifically disclaim coverage for losses that arise from a combination of excluded and covered causes, regardless of the sequence in which the various causes occurred. Because the provision did not do so and there was evidence that two perils combined to produce the loss, the *Kelly* Court concluded that the policy did not circumvent the efficient proximate cause doctrine and that a question of fact existed regarding the proximate cause of the loss.

¶ 33 We find the policy analysis made in *Kelly* persuasive, and that the identical policy language when applied to "settling" is similarly ambiguous. Moreover, *Kelly's* requirement for circumventing the efficient proximate cause doctrine is compatible with Oklahoma caselaw. *See Richardson v. Allstate*, 1980 OK 157, 619 P.2d 594. Because the lead-in clause to paragraph 1 in this case does not have the same or similar language as the lead-in clause to paragraph 2, which we previously decided clearly and unambiguously circumvents the doctrine, we conclude that paragraph 1 of the Losses Not Insured section of the Policy does not avoid application of Oklahoma's efficient proximate cause doctrine.

¶ 34 In this case, there is evidence of more than one possible concurring cause for Insureds' loss, *e.g.*, the water leak and erosion. Because there are disputed issues of fact in this case regarding proximate cause, the trial court did not err in denying Insur-er's motion for directed verdict on this specific issue.

*Tortious Breach of Insurer's Duty of Good Faith and Fair Dealing*

¶ 35 Insurer further alleges that the trial court erred as a matter of law by submitting to the jury Plaintiff's claim for breach of an insurer's duty to deal fairly and in good faith. In determining that Insureds' loss was excluded from coverage, Insurer argues that (1) it reasonably applied the clear and straightforward policy language, (2) there is a legitimate dispute over the application of the policy exclusions to Insureds' loss, (3) there is no Oklahoma authority which prohibits an insurance company from relying on the earth movement exclusion, and (4) numerous jurisdictions have decided that the same exclusion unambiguously applies to bar coverage where water from a broken plumbing line contributes to "earth movement."

¶ 36 Tort liability may be imposed only where there is a clear showing that the insurer, unreasonably and in bad faith, withholds payment of the claim of its insured. *Christian v. American Home Assurance Co.*, 1977 OK 141, 577 P.2d 899. Under Oklahoma law, bad faith cannot exist if an insurer's conduct was reasonable under the circumstances. *Manis v. Hartford Fire Ins. Co.*, 1984 OK 25, 681 P.2d 760.

¶ 37 *Manis* instructs that the tort of bad faith does not foreclose the insurer's right to deny a claim. An insurer clearly has the right to resist payment and litigate any claim to which the insurer has a reasonable defense. Resort to a judicial forum is not *per se* bad faith or unfair dealing on the part of the insurer regardless of the outcome of the suit. In such circumstances the insurer does not risk a tortious breach of contract.

¶ 38 A claim must be paid promptly unless the insurer has a reasonable belief that the claim is legally or factually insufficient. The decisive question is whether the insurer had a good faith belief, *at the time its performance was requested, that it had justifiable reason for withholding payment under the policy.* To determine the

validity of the claim, the insurer must conduct an investigation reasonably appropriate under the circumstances; knowledge and belief of the insurer during the time period the claim is being reviewed is the focus of a bad faith claim. *Buzzard v. Farmers Ins. Co., Inc.,* 1991 OK 127, 824 P.2d 1105.

¶ 39 In pursuing a claim of breach of a insurer's duty of good faith and fair dealing, the plaintiff carries the burden of proof and must plead the elements of this intentional tort, the essence of the tort being the unreasonable bad faith conduct of the insurer. *McCorkle v. Great Atlantic Insurance Co.,* 1981 OK 128, 637 P.2d 583. As alleged herein, the elements Insureds were required to establish in order to prove a *prima facie* case of Insurer's bad faith are (1) Insurer was required under the insurance policy to pay Insureds' claim; (2) Insurer's refusal to pay the claim in full was unreasonable under the circumstances because (a) it had no reasonable basis for the refusal, (b) it did not perform a proper investigation, or (c) it did not evaluate the results of the investigation properly; (3) Insurer did not deal fairly and in good faith with Insureds; and (4) Insurer's violation of its duty of good faith and fair dealing was the direct cause of the injury sustained by Insureds. *See* OUJI—Civ (2d) 22.2.

¶ 40 Having affirmed the trial court's denial of Insurer's motion for directed verdict on the breach of contract claim because there were questions of fact for the jury regarding both of the exclusions relied upon by Insurer for its denial of Insureds' claim, the first element was obviously for the jury to decide. However, the same cannot be said as to the second or fourth elements. An insurer's withholding of payment is not unreasonable or bad faith when there is a legitimate dispute concerning coverage and when there is no conclusive precedential legal authority on that issue. *Skinner v. John Deere Insurance Co.,* 2000 OK 18, 998 P.2d 1219.

¶ 41 The facts in this case demonstrate only that Insurer's conduct in withholding payment of the claim was reasonable. First, there was a legitimate dispute in interpreting both exclusions of the policy, neither of which have been judicially determined by Oklahoma courts. Second, the record reveals that Insurer's initial denial of the claim was based on Mr. Harris' many years of experience with the causes of a leaking pipe, his investigation of the premises, and his interpretation of the policy's exclusions based on the knowledge he had concerning the only loss/damage as of June of 1998—a leaking hot water pipe. The record further demonstrates that Mr. Steuernagel's reliance on additional exclusions for denial of coverage, *i.e.,* the settling and earth movement exclusions, did not arise until after February of 1999, when Insureds first showed him the pipe extracted by Leak Locators in June of 1998 and gave him a copy of Hale's Structural Report. Considering Insurer's knowledge and belief during the time it was reviewing Insureds' claim, the investigation was reasonably appropriate under the circumstances. Third, there is no competent evidence from which a jury could reasonably find that Insurer's alleged failure to perform a proper investigation was the direct or proximate cause of Insureds' loss. Based on *Skinner,* we conclude that the record in this case shows that Insurer acted reasonably, as a matter of law. Accordingly, the trial court erred in not directing a verdict in favor of Insurer on the bad faith claim and that part of its judgment must be reversed.

¶ 42 As a result of our reversal of Insureds' bad faith claim, we need not address Insurer's proposition alleging error in the trial court's submission of the issue of punitive damages to the jury. There can be no punitive damage award where there is no bad faith award. *Manis v. Hartford Fire Ins. Co.,* 1984 OK 25, 681 P.2d 760. Similarly, our resolution of Insureds' bad faith claim eliminates any need to address Insurer's allegation that the trial court erred in awarding prejudgment interest on the jury's bad faith award.

## CONCLUSION

¶ 43 The trial court's judgment is reversed insofar as it awards Insureds' damages for bad faith, pre-judgment interest on those damages and punitive damages. In all other

respects, the trial court's judgment is affirmed.

AFFIRMED IN PART AND REVERSED IN PART.

MITCHELL and BELL, JJ., concur.