HARTZ, Circuit Judge.
This appeal arises out of a claim under a commercial umbrella insurance policy. The district court entered summary judgment in favor of Great American Insurance Company, Inc., denying the claim of the Yaffe Companies, Inc. on the ground that the policy unambiguously precluded coverage. Yaffe Cos., Inc. v. Great Am. Ins. Co., No. CV-05-466-FHS, 2006 WL 1388448, at *3, *5 (E.D.Okla. May 12, 2006). We hold that the policy is ambiguous and reverse and remand for further proceedings.
I. BACKGROUND
On December 28, 2004, an explosion at Yaffe’s scrapyard in Muskogee, Oklahoma, caused significant property damage and bodily harm. When it filed its complaint, Yaffe had incurred $1,785,986.89 in liability on claims by numerous parties. Two insurance policies cover Yaffe’s liability. One is a commercial general-liability policy issued by ACE American Insurance Company (ACE). The policy provides coverage up to $1,000,000 per occurrence, with a general aggregate limit of $2,000,000 and a deductible of $10,000 per claim. The other policy is a commercial umbrella policy with Great American. As a general matter, umbrella policies provide two types of insurance coverage: (1) excess coverage for events also covered by other underlying insurance policies that provide primary protection and (2) primary coverage for events not covered by other policies. See Commercial Union Ins. Co. v. Walbrook Ins. Co., 7 F.3d 1047, 1053 (1st Cir.1993). The Great American policy has a coverage limit of $25,000,000. But its excess coverage does not begin until the amount that Yaffe “becomes legally obligated to pay,” Great American policy § I, exceeds the policy’s “Retained Limit,” which is “the total amounts stated as the applicable limits of the underlying policies [in the policy schedule],” id. § II.G.l. (Citations to the Great American policy, ApltApp. Vol. I at 73-132, will refer to sections of the policy rather than pages of the appendix.)
The source of the difficulty in this case is the type of deductible in the ACE policy. The deductible is $10,000 per claim. That the deductible is per-claim rather than per-oecurrence is apparently unusual. See 1 Barry R. Ostrager & Thomas R. Newman, Handbook on Insurance Coverage Disputes § 9.02, at 557 (2006) (in commercial general-liability policies “there is typically one deductible for each occurrence”). *1184 The nature of the deductible makes a substantial difference in the ACE policy’s coverage of the Muskogee explosion. Because most claims were under $10,000, the policy covers only $497,999.10 of Yaffe’s total liability of $1,785,986.89. If the $10,000 deductible had been per occurrence, ACE would have had to pay $1,000,000, and there would be no dispute that Great American must cover the total liability in excess of $1,000,000 (or perhaps $1,010,000).
Yaffe sought coverage from Great American in the amount of $785,986.89, the difference between the total amount of the claims against it arising from the explosion and $1,000,000. (Yaffe also raised a separate claim, but it is not pursued on appeal.) Great American denied the claim, noting that ACE had paid only $497,999.10 and asserting that the Great American policy does not provide coverage until the $1,000,000 limit of the ACE policy has been exhausted.
On October 14, 2005, Yaffe filed an action against Great American in Oklahoma state court, claiming that Great American had breached its insurance contract and seeking a declaration of coverage. Great American timely removed the case to the United States District Court for the Eastern District of Oklahoma on November 21, 2005, claiming diversity jurisdiction under 28 U.S.C. § 1332(a)(1) because Yaffe is an Oklahoma corporation with its principal place of business in Oklahoma and Great American is an Ohio corporation with its principal place of business in Ohio. The next day Great American filed a counterclaim against Yaffe, seeking a declaration that it has no obligation to provide coverage on claims arising from the Muskogee explosion until Yaffe has exhausted the ACE policy’s $1,000,000 limit.
On March 28, 2006, Great American moved for summary judgment. Yaffe responded and Great American replied. On April 21, shortly after Great American filed its reply in support of summary judgment, Yaffe moved to compel discovery, seeking information and documents from Great American regarding its construction of its umbrella policies with similar language. Yaffe then filed its own motion for summary judgment on May 5.
One week later, before Great American had filed a response to Yaffe’s summary-judgment motion, the district court granted Great American’s summary-judgment motion while denying Yaffe’s motion. It ruled that the Great American policy is unambiguous and that Great American is obligated to make payments under its policy only “when Yaffe becomes legally obligated to pay sums in excess of or, stated another way, after exhaustion of, the $1,000,000 coverage provided by the ACE policy.” Yaffe, 2006 WL 1388448, at *3. The district court also denied Yaffe’s motion to compel discovery, reasoning that such information, “while potentially relevant to a tort claim for bad faith,” had no relevance to the contract claims because it had determined that the contract was to be interpreted based on its language alone. ApltApp. Vol. 2 at 519 (Op. & Order, May 12, 2006). Judgment was entered the same day.
Yaffe appeals the grant of summary judgment to Great American, the denial of its own summary-judgment motion, and, in the alternative, the denial of its motion to compel discovery.
II. DISCUSSION
A. Standard of Review
“[A]n order denying summary judgment is reviewable when ... it is coupled with a grant of summary judgment to the opposing party.” Padfield v. AIG Life Ins. Co., 290 F.3d 1121, 1124 (9th Cir.2002); see McIntosh v. Scottsdale Ins. Co., 992 F.2d 251, 253 (10th Cir.1993) (“Where we re *1185 verse a summary judgment order in favor of one party, ... we will review the denial of the other party’s cross-motion for summary judgment under the same standards applied by the district court so long as it is clear that the party opposing the cross-motion had an opportunity to dispute the material facts.”); James Wm. Moore et al., Moore’s Federal Practice § 56.41 [1], at 56-284.1 (3d ed.2006); 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2715, at 268 (3d ed.1998). Thus, we review both the grant of summary judgment to Great American and the denial of summary judgment to Yaffe. “We review de novo a district court’s grant or denial of summary judgment, and we apply the same legal standard to be employed by the district court under Federal Rule of Civil Procedure 56(c).” Maldonado v. City of Altus, 433 F.3d 1294, 1302 (10th Cir.2006) (brackets and internal quotation marks omitted), overruled on other grounds as recognized by Metzler v. Fed. Home Loan Bank of Topeka, 464 F.3d 1164, 1171 n. 2 (10th Cir.2006). Summary judgment is appropriate if “there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law.” Fed.R.Civ.P. 56(c).
B. Motions for Summary Judgment
Yaffe contends that summary judgment for Great American was improper, and summary judgment for it was proper, because (1) the policy’s unambiguous terms require Great American to provide coverage once Yaffe’s liability for the explosion exceeded $1,000,000, and (2) even if the policy is ambiguous, that ambiguity must be construed against the drafter and in favor of Yaffe’s reasonable expectations of insurance coverage. Great American counters that summary judgment was proper because the terms of its policy unambiguously indicate that it is not obligated to provide coverage until the $1,000,000 per-occurrence limit of the ACE policy has been exhausted. It makes no alternative argument in the event that we hold the policy to be ambiguous.
Oklahoma substantive law applies to this diversity action. See Air Liquide Am. Corp. v. Cont’l Cas. Co., 217 F.3d 1272, 1275 (10th Cir.2000). Its approach to interpreting insurance policies is unremarkable:
The foremost principle is that an insurance policy is a contract. Parties are at liberty to contract for insurance to cover such risks as they see fit and they are bound by terms of the contract. It necessarily follows that courts are not at liberty to rewrite the terms of an insurance contract. The interpretation of the policy, with its exclusions, is a law question, unless the facts necessary to apply the decided law question are in dispute.
When addressing a dispute concerning the language of an insurance policy, our first step is to determine as a matter of law whether the policy language at issue is ambiguous. If it is not ambiguous, we accept the language in its plain, ordinary and popular sense. We must construe the policy to give a reasonable effect to all of its provisions, construing liberally words of inclusion in favor of the insured and construing strictly words of exclusion against the insurer.
Duensing v. State Farm Fire & Cas. Co., 131 P.3d 127, 134 (Okla.Civ.App.2005) (citations omitted) (summarizing Oklahoma Supreme Court caselaw). “Insurance contracts are ambiguous only if they are susceptible to two constructions.” Max True Plastering Co. v. U.S. Fid. & Guar. Co., 912 P.2d 861, 869 (Okla.1996). When a contract is ambiguous, extrinsic evidence is necessary to resolve the ambiguity. See Campbell v. Indep. Sch. Dist. No. 01 of Okmulgee County, 77 P.3d 1034, 1039 (Okla.2003). In considering ambiguous in- *1186 suranee contracts, courts “examine the policy language objectively to determine whether an insured could reasonably have expected coverage.... [AJmbiguities are construed most strongly against the insurer.” Max True, 912 P.2d at 865.
The parties rely on several different provisions of the Great American policy. We address them in turn. Section I states:
[Great American] will pay on behalf of [Yaffe] those sums in excess of the “Retained Limit” that [Yaffe] becomes legally obligated to pay by reason of liability imposed by law or assumed by [Yaffe] under an “insured contract” because of “bodily injury,” “property damage,” “personal injury,” or “advertising injury” that takes place during the Policy Period and is caused by an “occurrence” happening anywhere. The amount we will pay for damages is limited as described below in the Insuring Agreement Section II. LIMITS OF INSURANCE.
Great American policy § I. (Neither party suggests that the insured-contract language applies in this case.) Subsection II.G defines Retained Limit. It states:
We will be liable only for that portion of damages, subject to the Each Occurrence Limit stated in the Declarations, in excess of the “[Retained [L]imit,” which is the greater of:
1. the total amounts stated as the applicable limits of the underlying policies listed in the Schedule of Underlying Insurance and the applicable limits of any other insurance providing coverage to [Yaffe] during the Policy Period; or
2. the amount stated in the Declarations as Self-Insured Retention as a result of any one “occurrence” not covered by the underlying policies listed in the Schedule of Underlying Insurance nor by any other insurance providing coverage to [Yaffe] during the Policy Period;
and then up to an amount not exceeding the Each Occurrence Limit as stated in the Declarations.
Once the Self-Insured Retention has been exhausted by actual payment of “claims” in full by [Yaffe], the Self-Insured Retention will not be reapplied or again payable by [Yaffe] for said Policy Period.
Id. § II.G. (The parties agree that the latter of the two alternatives in § II.G— self-insured retention — is irrelevant to this appeal.) The Schedule of Underlying Insurance lists a per-occurrence limit of $1,000,000 for the ACE policy.
Great American contends that these provisions mean that its “obligation to pay is limited to Yaffe’s liability in excess of the limits of the underlying policy,” Aplee. Br. at 17, and consequently, “Great American has no obligation to pay under its umbrella policy until the limits of the ACE Primary Policy have been exhausted,” id. at 20. We disagree. The natural meaning of the above provisions, read together, is that the Great American policy provides coverage for liability of Yaffe above the Retained Limit of $1,000,000. Because Yaffe has “become[ ] legally obligated to pay” $1,785,986.89, Great American would be required to pay the amount in excess of $1,000,000, or $785,986.89. The policy defines the Retained Limit as the total of “amounts” that appear in the Schedule of Underlying Insurance. This schedule sets forth numbers representing policy limits of the underlying policies. If any other features of the underlying policies — such as the size of the deductible or whether the deductible is per-occurrence or per-claim — were relevant to computation of the Retained Limit, certainly those features would be described in the schedule. But the schedule sets forth only that the ACE *1187 policy has a general aggregate limit of $2,000,000 and a per-oceurrenee limit of $1,000,000. Indeed, the underwriting file that Great American created in preparing the policy does not include a description of the nature of the deductible; it states only that the ACE policy had a $10,000 deductible, with no specification of whether it applied per claim or per occurrence.
In our view the language in § I (Coverage) and § II.G (Retained Limit) of the Great American policy implies that coverage begins once Yaffe has incurred liabilities exceeding $1,000,000. Cf. U.S. Fire Ins. Co. v. Charter Fin. Group, Inc., 851 F.2d 957, 959 & n. 6, 963 (7th Cir.1988) (when excess policy defined “retained limit” as, in pertinent part, “the total of the applicable limits of the underlying policies listed” and underlying policy provided coverage of $100,000, court interprets excess policy as providing coverage for property damage beginning at $100,000 (internal quotation marks omitted)); Fried v. N. River Ins. Co., 710 F.2d 1022, 1024, 1026-27 & n. 6 (4th Cir.1983) (when excess policy defined “retained limit” as “ ‘the total of the applicable limits of the underlying policies listed in Schedule A hereof, and the applicable limits of any other underlying insurance available to the insured',’ ” court interprets policy as providing coverage “above the threshold level of the face value of the Schedule A policies” and notes that “[t]o hold otherwise subjects the insurer to unforeseeable and variable risks depending upon the underlying insurance actually maintained by any one of the potential insureds”). At oral argument Great American suggested that Yaffe’s construction of these provisions would free Yaffe from the bargain it made (at least implicitly) with ACE — namely, that in exchange for a reduced premium on the ACE policy, Yaffe agreed that the deductible would apply per claim rather than per occurrence and thereby risked having a much larger deductible in some instances. But Yaffe’s bargain with ACE should be irrelevant to the construction of the language of the Great American policy. And in any event, Yaffe has clearly paid, through the nose, for the bargain it made. Even under Yaffe’s construction of the Great American policy, a cheaper insurance policy with ACE with a per-claim deductible has caused it to have to pay more than $500,000 in deductibles before Great American starts to pay.
The dissent argues that our reading of §§ I and II.G must be wrong because it renders irrelevant the actual coverage by the underlying policies. “[I]t would have been far simpler,” says the dissent, “to establish a set deductible amount, rather than to establish that amount by reference to the applicable limits of the underlying insurance policies.” Op. (Briscoe, J., dissenting) at 1194. We are not persuaded. The policy definition of Retained Limit is the sum of the limits of all insurance policies providing coverage to Yaffe, not just the policies listed in the Schedule of Underlying Insurance. See § II.G. If the policy stated simply “a set deductible amount,” the Retained Limit would not be automatically increased, as it is under the present language, if Yaffe acquired additional underlying insurance.
The dissent also asserts that there would be no need for § VI.I of the policy, which requires Yaffe to maintain its underlying insurance, if Great American’s coverage depends only on amounts set forth on the Schedule of Underlying Insurance. We note that Great American itself has made no such argument. On the contrary, its brief to this court chastises Yaffe for raising on appeal an argument based on § VI.I that it had not raised below. It continues: “Moreover, the argument is irrelevant as Yaffe did maintain underlying insurance, and ACE is paying claims pursuant to its primary policy.” Aplee. Br. *1188 at 42. In any event, § VI.I serves a clear purpose even under our interpretation of Retained, Limit For one thing, the actual coverage provided by the ACE policy and the exhaustion of the limits of that policy affect Great American’s duty (1) to defend Yaffe, see § III.A, discussed below, and (2) to make payments for appeal bonds, prejudgment interest, and costs, see § III.B.3 (regarding litigation expenses). Thus, § VI.I is not superfluous. Despite the dissent’s arguments, we believe that the most reasonable reading of §§ I and II.G is that Great American is obligated to pay once Yaffe has incurred liabilities exceeding $1,000,000.
Other provisions in the Great American policy, however, are less clear than the above and provide at least some support for Great American’s construction. Subsection VI.P of the policy, entitled “When Loss is Payable,” sets independent conditions on if (as well as when) Great American must pay. It states, in pertinent part:
Coverage under this policy will not apply unless and until [Yaffe ] or [Yaffe’s ] underlying insurer is obligated to pay the “[Retained [LJimit.”
Great American policy § VI.P (emphasis added). Initially it may appear that the plain meaning of the provision is that coverage under the policy begins when either Yaffe or ACE is obligated to pay $1,000,000. When the Coverage provision of the policy speaks of “sums ... that [Yaffe] becomes legally obligated to pay by reason of liability imposed by law,” id. § I, it is undoubtedly including sums paid by underlying insurance coverage. Thus, when § VI.P refers to what Yaffe “is obligated to pay,” it must be referring to Yaffe’s legal liability, regardless of whether Yaffe is protected by insurance coverage for that liability. Because Yaffe has been obligated to pay more than $1,000,000 as the result of the Muskogee explosion, there would seem to be coverage under the Great American policy. But this construction of the provision renders the words “or [Yaffe’s] underlying insurer” superfluous because Yaffe’s underlying insurer, whose obligation derives from Yaffe’s, would be obligated to pay only when Yaffe itself would be obligated.
A possible alternative reading of § VI.P that avoids rendering the reference to Yaffe’s insurer as surplusage would be based on the recognition that umbrella coverage protects against identified gaps in underlying policies. “Umbrella policies differ from standard excess policies in that they are designed to fill gaps in coverage both vertically (by providing excess coverage) and horizontally (by providing primary coverage).” Commercial Union Ins. Co., 7 F.3d at 1053. It may be, therefore, that § VI.P should be read to say that coverage under the Great American policy applies only when either Yaffe (in the case of an event not covered by other insurance) or Yaffe’s underlying insurer (in the case of an event covered by other insurance) is obligated to pay the Retained Limit. Because the Muskogee explosion is undoubtedly covered by the ACE policy, § VI.P would then mean that Great American’s obligation is triggered only after ACE has become obligated to pay $1,000,-000 — that is, only after the ACE coverage has been exhausted.
A third reading, which arrives at the same conclusion, is proffered by Great American and was adopted by the district court. Under that reading the purpose and effect of the reference to Yaffe’s obligation in § VI.P is merely to protect Yaffe in the event of default by its primary insurer, ACE. If ACE, because of insolvency or unjustified refusal to pay, does not pay its obligations and Yaffe is forced to pay covered liabilities itself, Great American would count such payments under § VI.P. This third reading avoids the *1189 surplusage problem with the first reading, but neither Great American nor the district court has explained how it derived this meaning from the language of the policy.
Subsection VI.J, entitled “Other Insurance,” sets a further condition on payment by Great American. It, too, is subject to more than one reasonable construction. It states:
If other insurance applies to a loss that is also covered by this policy, this policy will apply excess of the other insurance. Nothing herein will be construed to make this policy subject to the terms, conditions, and limitations of such other insurance. However, this provision will not apply if the other insurance is specifically written to be excess of this policy.
Great American policy § VI.J. The phrase “excess of the other insurance” is not defined in the policy. There is support for Great American’s view that the phrase means that the policy applies only “after the primary coverage limits have been exhausted.” U.S. Fid. & Guar. Co. v. Federated Rural Elec. Ins. Corp., 37 P.3d 828, 831 (Okla.2001) (“Primary insurance provides immediate coverage for the insured upon the occurrence of a loss or the happening of an event which, under the terms of the policy, gives rise to immediate liability.... An excess insurance policy is one which by its terms provides coverage that is secondary to the primary coverage; there is usually no obligation to the insured until after the primary coverage limits have been exhausted.”).
But a general description of insurance policies, such as that in U.S. Fidelity & Guaranty Co., must yield to the specific language of a particular policy. Oklahoma law imposes coverage when “an insured could reasonably have expected coverage” based on the policy language, Max Tme, 912 P.2d at 865; and to a reasonable person looking only at this language, the phrase “excess of the other insurance” could well mean “to the extent that the other insurance is not required to pay (even if the other insurance applies to the loss).” Under this reading, § VI.J would come into play to limit Great American’s duty to pay only when both the Great American policy and another policy (in this case, the ACE policy) require payment. This could happen if, for example, a new $50,000 claim arising out of the explosion were added to the claims against Yaffe. Because of the $10,000 per-claim deductible in the ACE policy, ACE would be obligated to pay $40,000. Because under Yaffe’s construction of the policy the Great American deductible had been exceeded, Great American would be obligated for the entire $50,000. Great American would be the only insurer obligated to pay the first $10,000, so it would owe that sum. As to the remaining $40,000, both Great American and ACE would be liable, so § VI.J would presumably impose the obligation on ACE. See Lee R. Russ, Couch on Insurance § 219:1 (3d ed. 2007) (“ ‘Other insurance’ clauses govern the relationship between insurers[;] they do not affect the right of the insured to recover under each concurrent policy.”).
Finally, both parties claim to find support for their positions in § III.A of the Great American policy, entitled “Defense.” (Yaffe has not claimed, however, that Great American actually had any obligation to defend it against any of the claims arising out of the explosion). It provides:
[Great American] will have the right and duty to investigate any “claim” and defend any “suit” seeking damages covered by the terms and conditions of this policy when:
1. the applicable Limits of Insurance of the underlying policies listed in the Schedule of Underlying Insurance *1190 and the Limits of Insurance of any other insurance providing coverage to [Yaffe] have been exhausted by actual payment of “claims” for any “occurrence” to which this policy applies; or
2. damages are sought for any “occurrence” which is covered by this policy but not covered by any underlying policies listed in the Schedule of Underlying Insurance or any other insurance providing coverage to [Yaffe].
Great American policy § III.A. Both parties seem to agree that this provision requires (and permits) Great American to investigate and defend a claim when the limits of ACE’s coverage have been exhausted. It would seem peculiar, however, for the policy to require payment by Great American before Great American’s right and duty to investigate and defend arises. Great American should not be required to pay on a claim against Yaffe without having the opportunity to protect its interests by investigating and defending the claim. Yet that could be the case under Yaffe’s interpretation of the policy because the duty to pay could arise before exhaustion of ACE’s coverage, which is what triggers the right and duty to investigate and defend. One could thus infer that the duty to pay must not arise until the § III.A rights and duties arise — namely, upon exhaustion of the ACE coverage.
But Yaffe has a reasonable contrary argument. It argues that the language of § III.A shows that the drafters of the policy could require “exhaustion” of coverage when they wanted to. It contends that this section “shows precisely how unambiguous language can and should provide for a requirement that underlying insurance be ‘exhausted.’ ” Aplt. Br. at 27. The failure to use such language in §§ I and II.G, it contends, therefore shows that the Retained Limit could be exceeded before exhaustion of the underlying coverage. In our view § III.A does not unambiguously indicate whether Great American’s obligation to pay begins only when the ACE policy’s limits have been exhausted.
In sum, we believe that the Great American policy is susceptible to more than one reasonable construction; it is not unambiguous. Summary judgment in favor of Great American on this ground was therefore improper. Furthermore, Great American does not argue on appeal that it would be entitled to summary judgment even if the policy were ambiguous, so we do not address such a possibility and instead conclude that the grant of summary judgment to Great American must be reversed.
In light of the above discussion, we also must conclude that the district court’s ground for denying Yaffe’s motion for summary judgment — namely, that the Great American policy unambiguously indicated that Great American had no obligation to pay until the ACE policy was exhausted — was erroneous. This does not mean, however, that Yaffe is now entitled to summary judgment. All we have decided is that the Great American policy is ambiguous. Yaffe would have us take the next step. It contends that it is entitled to summary judgment because (1) any ambiguity in the policy must be construed against the drafter of the policy, Great American, and in favor of coverage; and (2) it had a reasonable expectation that the policy would provide coverage. But at this stage of the proceeding we must disagree. Great American had no opportunity to respond to Yaffe’s summary-judgment motion, and entry of summary judgment against it would therefore be improper.
“Federal Rule of Civil Procedure 56 implicitly requires the district court to allow the nonmoving party an opportunity to respond before summary judgment is en *1191 tered against it.” See Beaird v. Seagate Tech., Inc., 145 F.3d 1159, 1163 (10th Cir.1998). But the district court granted Great American’s motion for summary judgment one week after Yaffe filed its motion for summary judgment, well before Great American’s response was due. In its response Great American may have pointed to extrinsic evidence that resolved any ambiguity in the policy and would have defeated Yaffe’s motion. Given the district court’s grounds for its ruling on the merits, proceeding to deny Yaffe’s motion was hardly improper. Now that we have reversed that ruling, however, Great American is entitled to an opportunity to respond to Yaffe’s motion. Accordingly, we must remand for further proceedings. Cf. Doebele v. Sprint/United Mgmt. Co., 342 F.3d 1117, 1139 (10th Cir.2003) (district court abused its discretion in granting summary judgment when it relied on new materials in reply brief without giving the nonmovant an opportunity to file a surre-ply; because appellate court was reversing summary judgment for other reasons, “[a]ny prejudice flowing from [appellant’s] inability to reply to this material may be corrected on remand”).
C. Motion to Compel Discovery
As an alternative to its argument that it be granted summary judgment, Yaffe argues for reversal of the district court’s denial of its motion to compel discovery. The district court denied the motion to compel on the ground that the Great American policy was unambiguous. Because we have determined that the relevant terms of the policy are ambiguous, we remand this issue to the district court for reconsideration.
III. CONCLUSION
We REVERSE the district court’s grant of summary judgment to Great American and REMAND for further proceedings.