**FILED**
**United States Court of Appeals**
**Tenth Circuit**

UNITED STATES COURT OF APPEALS

FOR THE TENTH CIRCUIT

**December 27, 2024**

**Christopher M. Wolpert**
**Clerk of Court**

_____

PATRICK OGLESBEE; KATHREN D.
OGLESBEE,

     Plaintiffs - Appellants,

v.

GLOCK, INC.,

     Defendant - Appellee.

No. 23-5134
(D.C. No. 4:18-CV-00560-GKF-CDL)
(N.D. Okla.)

_____

ORDER AND JUDGMENT[*]
_____

Before **MATHESON**, **McHUGH**, and **ROSSMAN**, Circuit Judges.
_____

Patrick Oglesbee purchased a used Glock pistol that had been modified after it left the possession and control of Glock, Inc.  While providing firearm training, he dropped the pistol, which fired when it hit the ground and shot him in the leg.  With his wife, Kathren Oglesbee, he sued Glock, alleging products liability, failure to warn, and negligence.

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel.  It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

Applying Oklahoma law, the district court granted summary judgment for Glock on all claims, holding that the pistol was not unreasonably dangerous because Glock provided adequate warnings about the risk of using a modified pistol. The Oglesbees appealed.

Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## I.  BACKGROUND

### A.  *Factual History*[1]

#### 1.  The Drop Fire Incident

Mr. Oglesbee, a certified firearms instructor, has "extensive firearms experience with hundreds of hours of training on various weapons systems." App., Vol. I at 86; App., Vol. II at 476. While providing a firearm training, he attempted to holster the modified Glock pistol, but it fell to the ground and fired, shooting him in the leg. Mr. Oglesbee lost his leg from this "drop fire" incident.[2]

#### 2.  The Pistol and Modifications

Glock pistols contain the "Glock Safe Action System," which includes a trigger safety, firing pin safety, and drop safety. The system automatically engages after the pistol is fired to prevent unintentional discharges such as drop fires.

---

[1] On appeal from summary judgment, "we examine the record and all reasonable inferences that might be drawn from it in the light most favorable to the non-moving party." *Pinkerton v. Colo. Dep't of Transp.*, 563 F.3d 1052, 1058 (10th Cir. 2009) (quotations omitted).

[2] A "drop fire" incident occurs "when a pistol is dropped or falls onto a surface and a round of ammunition is unintentionally discharged." App., Vol. I at 82 n.2.

2

Mr. Oglesbee purchased the pistol in 2012. The pistol had been modified with "aftermarket" parts—a trigger spring, firing pin spring, firing pin safety spring, and internal connector piece—that differed from the corresponding Glock factory parts.[3] The aftermarket trigger spring had more tension than its Glock counterpart. The aftermarket firing pin spring and firing pin safety spring had less tension. This combination of aftermarket parts prevented the trigger from returning to its fully forward position after firing and from re-engaging the trigger safety.[4]

3. **The Warnings**

Mr. Oglesbee received and reviewed the Glock Instructions for Use Manual for his pistol. It contains multiple warnings about unintentional discharges from modified pistols. The first warning straddles pages three and five:

> **WARNING:**
>
> GLOCK PISTOLS HAVE SEVERAL INTERNAL DESIGN FEATURES AND MECHANICAL SAFETIES, DESIGNED TO PREVENT AN ACCIDENTAL DISCHARGE SHOULD THE PISTOL BE DROPPED OR RECEIVE A SEVERE BLOW TO THE MUZZLE, FRONT, OR BACK OF THE PISTOL.
>
> THEREFORE, EXTRA CARE AND <u>STRICT ADHERENCE TO THE SAFETY INSTRUCTIONS AND OTHER INSTRUCTIONS CONTAINED IN THIS</u>

---

[3] Aftermarket parts for Glock pistols are made by other manufacturers. *See* App., Vol. II at 284, 286, 456. Thousands of aftermarket parts combinations can be used to modify Glock pistols. *See id.* at 278-79, 463-64.

[4] Mr. Oglesbee also modified the pistol. But no party contends his modifications contributed to the drop fire.

MANUAL BY THE GUN USER IS <u>MANDATORY</u> FOR
MINIMIZING THE RISK OF ACCIDENTS.

. . . THE PROPER AND SAFE FUNCTION OF THIS
PISTOL IS
\*     \*     \*     \*

BASED ON THE PREMISE THAT PARTS ARE NOT
ALTERED OR MODIFIED, AND THAT THE PISTOL IS
USED FOR ITS INTENDED PURPOSE.

App., Vol. I at 166-67.[5]

The Manual also warns that an ineffective trigger safety may lead to an

unintentional discharge:

**WARNING:**

In case the trigger safety proves to be ineffective for any
reason, DANGER of an unintentional discharge exists.  THE
WEAPON IS THEN TO BE IMMEDIATELY UNLOADED
AND RESTRICTED FROM ANY FURTHER USE.  MAKE
SURE THAT YOUR WEAPON IS PROPERLY REPAIRED
AND CHECKED BY GLOCK INC. AUTHORIZED
PERSONNEL BEFORE USING IT AGAIN!

*Id.* at 167.

The Manual further warns that "disassembly by the user" beyond basic field

stripping to clean the gun "is neither required nor recommended, and should only be

performed by a GLOCK-certified armorer." *Id.* at 186.[6]  The Manual does not

---

[5] As indicated by asterisks, the warning cuts off midsentence on page three of the
Manual and resumes on page five, the next page in English.

[6] "Field stripping" is "user-level, partial disassembly of a firearm that is performed
without tools to allow for routine cleaning and lubrication of the major components."
App., Vol. I at 93 n.10, 185-87; App., Vol. II at 480.

provide instructions on how to remove and replace the trigger spring, firing pin spring, firing pin safety spring, or the internal connector piece.

4. **Testing Instructions**

The Manual also contains instructions for inspecting the pistol and testing its safety features. It states that when "[p]erformed at regular intervals," the testing instructions "can help to confirm that [the pistol] is functioning properly." *Id.* at 188. The Manual provides 13 testing instructions and states that "[f]ailure of any of the following checks, which cannot be remedied by cleaning should be referred to GLOCK, Inc., your local GLOCK dealer, or a GLOCK-certified Armorer." *Id.*

The testing instructions warn that if the "firing pin safety fails to keep the firing pin from moving forward" or if "the trigger safety fails to keep the trigger from moving rearward and the pistol dry fires DO NOT LOAD OR FIRE YOUR GLOCK PISTOL." *Id.* These warnings emphasize that if the "trigger safety proves to be ineffective for any reason, DANGER of an unintentional discharge exists." *Id.* at 167.

After he purchased the modified Glock and before the drop fire incident, Mr. Oglesbee reviewed the testing instructions and performed number 10, the "REASSEMBLY AND TRIGGER SAFETY CHECK":

> Reassemble the pistol. BE SURE THAT THE PISTOL IS UNLOADED, and cycle the slide to reset the trigger to the forward position. With the pistol pointed in a safe direction, grasp the sides of the trigger (without touching or depressing the trigger safety) and attempt to pull the trigger to the rear. The trigger safety should prevent rearward movement of the trigger, and the pistol should not dry fire.

*Id.* at 188; *id.* at 94, 156-58; App., Vol. II at 480.

Mr. Oglesbee "only relied upon . . . instruction 10 to check the Trigger Safety engagement." App., Vol. II at 500. He thus admits he did not rely on number 11, the "TRIGGER RESET TEST":

> Being sure that the pistol is UNLOADED and pointed in a safe direction, pull the trigger and hold the trigger to the rear. You should hear and feel the firing pin fall. Pull the slide to the rear and release it, allowing it to snap forward. Now release the trigger. The trigger should reset to its forward position. Repeat several times.

App., Vol. I at 188.

## B. *Legal Background*

"In a diversity case . . . the *Erie* doctrine requires federal courts to apply federal procedural law and state substantive law." *Banner Bank v. Smith*, 30 F.4th 1232, 1238 (10th Cir. 2022); *see Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). As the parties agree, Oklahoma substantive law governs this case. "[O]ur duty is simply to ascertain and apply the state law." *Gerson v. Logan River Acad.*, 20 F.4th 1263, 1277 (10th Cir. 2021) (quotations omitted). We review the district court's interpretation of state law de novo. *Genzer v. James River Ins. Co.*, 934 F.3d 1156, 1164 (10th Cir. 2019).

### 1. Products Liability

Under Oklahoma products liability law, a manufacturer that sells a "product in a defective condition, which is unreasonably dangerous to the user or consumer, is strictly liable for the physical harm to the person or property caused by the defect."

6

*Johnson v. Ford Motor Co.*, 45 P.3d 86, 91 (Okla. 2002).  In *Kirkland v. General Motors Corp.*, 521 P.2d 1353 (Okla. 1974), the Oklahoma Supreme Court stated the elements of a products liability claim:  (1) "the product was the cause of the injury," (2) "the defect existed in the product . . . at the time the product left the manufacturer's possession and control," and (3) "the defect made the [product] unreasonably dangerous to [the user] or to his property."  *Id.* at 1363.

A plaintiff may establish element two by showing that a third party's "subsequent modification" that created the defect "was foreseeable."  *Saupitty v. Yazoo Mfg. Co.*, 726 F.2d 657, 659 (10th Cir. 1984).

A plaintiff may establish element three—that the defect made the product "unreasonably dangerous"—by satisfying the "consumer expectations test," which requires a showing that the product is "dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics."  *Woods v. Fruehauf Trailer Corp.*, 765 P.2d 770, 774 (Okla. 1988) (quoting Restatement (Second) of Torts § 402A cmt. i (Am. L. Inst. 1965)); *see Braswell v. Cincinnati Inc.*, 731 F.3d 1081, 1087-89 (10th Cir. 2013).[7]  This test cannot be met "if the product contains a

---

[7] Oklahoma courts have not adopted the alternative "risk-utility test" for an unreasonably dangerous product from the Third Restatement—whether "an alternative design would provide greater overall safety" and "could be implemented at reasonable cost."  Restatement (Third) of Torts:  Prod. Liab. § 2 cmt. g (Am. L. Inst. 1998); *see Braswell*, 731 F.3d at 1089 ("[T]here is no sign that Oklahoma has backed away from the consumer expectations test since the release of the Third Restatement in 1998.").

warning that adequately addresses the known risks of use." *McPhail v. Deere & Co.*, 529 F.3d 947, 958 (10th Cir. 2008).

An adequate warning "cover[s] all foreseeable use." *Smith v. U.S. Gypsum Co.*, 612 P.2d 251, 253 (Okla. 1980). With an adequate warning, a "potentially dangerous" product "escape[s] being unreasonably dangerous." *Id.* at 254. Oklahoma courts "do not require . . . granular specificity for warnings," but the warnings must cover the "salient dangers," *Braswell*, 731 F.3d at 1090, and "be readily understandable," *Smith*, 612 P.2d at 254. "Where warning is given, the seller may reasonably assume that it will be read and heeded . . . ." *Braswell*, 731 F.3d at 1087 (quotations omitted); Restatement (Second) of Torts § 402A cmt. j. (Am. L. Inst. 1965).

Warnings are insufficient when they are "unclear or inadequate to apprise the consumer" of the danger. *Smith*, 612 P.2d at 253-54. Then "[a] manufacturer cannot defend on the basis that perfect compliance with its instructions" for using the product "would have prevented the accident." *Karns v. Emerson Elec. Co.*, 817 F.2d 1452, 1457 (10th Cir. 1987) (quotations omitted).

2. **Failure to Warn**

Under Oklahoma law, courts may address products liability and failure to warn claims together because "warnings sufficient to counteract an otherwise dangerous design" for the products liability claim "usually satisfy the manufacturer's duty to warn." *Braswell*, 731 F.3d at 1085, 1092 & n.3. *Compare AlNahhas v. Robert Bosch Tool Corp.*, 706 F. App'x 920, 931 (10th Cir. 2017) (unpublished) (addressing the

8

claims separately where the "parties have consistently discussed . . . design defect and failure to warn as if they are two entirely distinct claims" and the "district court followed that approach"), *with Braswell*, 731 F.3d at 1085, 1092 (analyzing failure to warn and products liability claims together).[8]

Here, we address the products liability and failure to warn claims together because the parties and the district court have not treated them as distinct claims. *See* App., Vol. IV at 1107, 1113 (district court analyzing products liability and failure to warn claims together); Aplt. Br. at 10-11, 15-21 (not distinguishing the failure to warn claim from the products liability claim); Aplee. Br. at 1, 18, 20-29 (advancing products liability and failure to warn arguments together).

3.  **Negligence**

"Even with the advent of strict products liability, the negligence cause of action remains available to a plaintiff injured by a defective product." *Braswell*, 731 F.3d at 1093 n.4 (quoting *Honeywell v. GADA Builders, Inc.*, 271 P.3d 88, 96 (Okla. Civ. App. 2011)). The plaintiff must establish (1) "a duty on the part of the defendant to protect the plaintiff from injury," (2) "the failure of the defendant to perform that duty," and (3) "injury to the plaintiff resulting from such failure." *Woods*, 765 P.2d at 775. For a negligence claim based on a defective product, the

_____

[8] We cite unpublished cases as persuasive under Fed. R. App. P. 32.1(A) and 10th Cir. R. 32.1.

plaintiff may allege negligent product design or a breach of the duty to warn. *See Braswell*, 731 F.3d at 1085, 1093; *Smith*, 612 P.2d at 254 n.3.

### C. *Procedural History*

After the drop fire incident, the Oglesbees sued Glock for products liability, failure to warn, negligence, and breach of implied warranty of fitness for a particular purpose.[9]  The district court, exercising diversity jurisdiction, granted Glock's motions for summary judgment on all four claims.[10]

The district court addressed the *Kirkland* products liability elements.  On element one, it described how the pistol caused Mr. Oglesbee's injury.  The court did not reach element two, stating it "decline[d] to speculate as to the scope of foreseeability" under Oklahoma law.  App., Vol. IV at 1109.  On element three, it said that "even where a product's design defect makes the product unreasonably dangerous, Oklahoma law does not impose liability if the product contains a warning that adequately addresses the known risks of use." *Id.* (quoting *McPhail*, 529 F.3d at 958).  It found the "undisputed facts demonstrate that Glock explicitly warned against the salient danger—a drop fire—in the event that the internal design features or mechanical safeties were altered." *Id.* at 1111.  And "[b]ecause Glock's warnings

---

[9] The Oglesbees named other defendants but dismissed all claims against them.

[10] The Oglesbees do not appeal the summary judgment ruling on the claim for breach of implied warranty of fitness for a particular purpose.

adequately addressed the known risks," the pistol "was not unreasonably dangerous and Glock cannot be liable." *Id.* at 1112-13.

The district court thus granted summary judgment on both the products liability and failure to warn claims because "no genuine dispute of material fact exists as to the adequacy of Glock's warnings." *Id.* at 1112. It also granted summary judgment on the negligence claim because "a showing that the [pistol] was unreasonably dangerous is necessary to each of the Oglesbees' negligence theories." *Id.* at 1114-15.

The Oglesbees timely appealed.

## II. DISCUSSION

The Oglesbees argue there is a genuine dispute of material fact on the warnings' adequacy. *See* Aplt. Br. at 16. We disagree.

### A. *Summary Judgment*

"We review a district court's grant of summary judgment de novo, using the same standard applied by the district court pursuant to Fed.R.Civ.P. 56(a)." *Cillo v. City of Greenwood Vill.*, 739 F.3d 451, 461 (10th Cir. 2013). We will affirm a grant of summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he dispute about a material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). We "view facts in the light most favorable to the

11

non-mov[ants] . . . resolving all factual disputes and reasonable inferences in their favor." *Cillo*, 739 F.3d at 461 (quotations omitted).

## B. *Analysis*

Glock was entitled to summary judgment on its products liability, failure to warn, and negligence claims because its warnings were adequate and the pistol was thus not unreasonably dangerous.

On the three *Kirkland* elements for a products liability claim, the district court (1) said the pistol caused Mr. Oglesbee's injury; (2) "decline[d] to speculate" on whether the modifications to the pistol with aftermarket parts were foreseeable, App., Vol. IV at 1109; and (3) determined the pistol was not unreasonably dangerous because Glock's warnings were adequate. This appeal concerns the third element.

### 1. Products Liability

The district court properly granted summary judgment because the Oglesbees could not show the pistol was unreasonably dangerous. *See Kirkland*, 521 P.2d at 1363. As previously noted, "Oklahoma law does not impose liability if the product contains a warning that adequately addresses the known risks of use." *McPhail*, 529 F.3d at 958. The warnings here were adequate under Oklahoma law.[11]

---

[11] The Oglesbees argue the pistol was unreasonably dangerous because Glock "could and should have adapted the internal safety mechanisms to accommodate such easily anticipated modifications" with aftermarket parts "but did not." Aplt. Br. at 22; *see also id.* at 3. But this argument invokes the "risk-utility test," which provides that "manufacturers ha[ve] a duty to eliminate dangers where an alternative design could do so without imposing unreasonable costs or impairing the functionality of the product." *Braswell*, 731 F.3d at 1088; Restatement (Third) of Torts: Prod. Liab. § 2 cmt. g (1998).

a. *Warnings*

The warnings were "readily understandable," covering the "foreseeable use,"

*Smith*, 612 P.2d at 253-54, of a pistol modified with aftermarket parts and the "salient

danger[]" of drop fire, *Braswell*, 731 F.3d at 1090.

The Manual warns that the "proper and safe function of this pistol is based on

the premise that parts are not altered or modified," including the function of "several

internal design features and mechanical safeties, designed to prevent an accidental

discharge should the pistol be dropped." App., Vol. I at 166-67. This warning

identifies the "salient danger[]" of a drop fire from the foreseeable use of a modified

pistol. *Braswell*, 731 F.3d at 1090. The Manual further warns that "disassembly by

the user" beyond steps listed in the Manual to clean the gun "is neither required nor

recommended, and should only be performed by a GLOCK-certified armorer." App.,

Vol. I at 186. The Oglesbees have not shown that a reasonable jury could find these

warnings to be inadequate. Their arguments on appeal are unavailing.

First, they argue that a "blanket statement recommendation to users not to alter

or modify the Glock pistol" is inadequate because it does not "alert the user as to

which modifications will affect the overall safety of the firearm." Aplt. Br. at 7

(quotations omitted). But the warnings caution against all modifications, and

Oklahoma does "not require . . . granular specificity for warnings." *Braswell*,

---

Oklahoma has not adopted the risk-utility test, so the Oglesbees' argument is unavailing. *See Braswell*, 731 F.3d at 1087-89.

13

731 F.3d at 1090. Indeed, a litany of warnings about the numerous combinations and permutations of aftermarket parts modifications would risk providing a warning that is not "readily understandable." *Smith*, 612 P.2d at 254; *see* App., Vol. I at 91; App., Vol. II at 478. Glock's warnings adequately covered the "salient danger[]" of drop fire "accompanying [the] operation" of a modified pistol. *Braswell*, 731 F.3d at 1090.

Second, the Oglesbees complain that the first warning begins on page three of the Manual and resumes on page five, with a page of Spanish instructions in between. *See* Aplt. Br. at 8, 17-18. But the all-caps warning runs on consecutive English-language pages, *see* App., Vol. I at 166-67, and is "readily understandable," *Smith*, 612 P.2d at 254. The layout of the warning could be better but does not render it "unclear or inadequate to apprise the consumer" of the danger. *Id.* at 253-54.

b. *Testing instructions*

The testing instructions complement the warnings. They caution that "[i]n case the trigger safety proves to be ineffective for any reason, DANGER of an unintentional discharge exists." App., Vol. I at 167. The Manual lists 13 testing instructions to inspect the pistol and warns that "[f]ailure of any of the following checks . . . should be referred to GLOCK, Inc., your local GLOCK dealer, or a GLOCK-certified Armorer." *Id.* at 188. The Manual further warns that "strict adherence to the safety instructions and other instructions contained in this manual by the gun user is mandatory for minimizing the risk of accidents." *Id.* at 166. Thus,

14

failure to complete all of the testing instructions could risk an unintentional discharge due to the trigger safety failing to engage. *See Braswell*, 731 F.3d at 1089-90.

Glock "may reasonably assume that [its warnings] will be read and heeded." *Id.* at 1087. Despite the Manual's directive to complete all of the testing instructions, Mr. Oglesbee relied only on instruction 10. The Oglesbees argue this instruction is the "only appropriate trigger safety test" and that it gives "a false indication to the user that the [trigger] safety is operating correctly." Aplt. Br. at 20. But testing instruction 11 describes how to test whether the "trigger . . . reset[s] to its forward position" to ensure that the trigger safety will engage, App., Vol. I at 188; *see id.* at 90; App., Vol. II at 477, and Mr. Oglesbee did not rely on instruction 11. He therefore did not follow "strict adherence" to the testing instructions, which is "mandatory for minimizing the risk of accidents." App., Vol. I at 166.

The Oglesbees' further assertion that instruction 11 fails to "provide user guidance" rings hollow, especially when Mr. Oglesbee did not attempt to follow instruction 11. Aplt. Br. at 20. In particular, the Oglesbees say an instruction 11 test would not reveal whether the trigger is in the fully forward position to reengage the safety. *Id.* at 9, 20-21.[12] But they do not base this assertion on Mr. Oglesbee's having performed the test, or support it with evidence regarding instruction 11.

_____

[12] We do not address the Oglesbees' argument that testing instructions 10 and 11 were inadequate because they do not "includ[e] demonstrative photographs" for the user to visually "determine whether the trigger is in a fully forward position." Aplt. Br. at 20. They did not present this argument to the district court. "[W]e generally do not consider new theories on appeal—even those that fall under the same general category as one that was presented in the district court." *Utah Animal Rts. Coal. v. Salt Lake County*,

\*    \*    \*    \*

In sum, a rational trier of fact could not find that the warnings and testing instructions were inadequate under Oklahoma law. The pistol was therefore not unreasonably dangerous under *Kirkland* element three, and Glock was entitled to summary judgment.

## 2. Failure to Warn

Glock is entitled to summary judgment on the failure to warn claim because there is no genuine dispute of material fact as to the adequacy of the warnings. As in *Braswell*, the warnings here are "sufficient to counteract an otherwise dangerous design" for the products liability claim and "satisfy [Glock's] duty to warn" for the failure to warn claim. 731 F.3d at 1092 & n.3.

## 3. Negligence

Because the warnings were adequate and thus the pistol was not unreasonably dangerous, the Oglesbees' negligence claim also fails because they alleged and argued that their negligence claim hinged on whether the pistol was unreasonably dangerous. App., Vol. I at 72, 75 (alleging that Glock "negligently designed, manufactured, marketed, instructed, tested, and/or distributed the Glock pistol . . . which rendered the firearm unreasonably dangerous" and "[a]s a result of [Glock's] acts or inactions, including . . . negligent acts, Mr. Oglesbee's pistol was

---

566 F.3d 1236, 1244 (10th Cir. 2009). Because the Oglesbees do not argue for plain error review of this forfeited argument, they have waived it on appeal. *United States v. MacKay*, 715 F.3d 807, 831 (10th Cir. 2013).

unreasonably dangerous and caused or proximately caused his injuries and damages"); Aplt. Br. at 23-24 (arguing because the district court erred in finding the pistol unreasonably dangerous as a matter of law, "the court's ruling on the negligence claims must necessarily be reversed as well"). We therefore affirm summary judgment on the negligence claim.

## III.  CONCLUSION

We affirm the district court's judgment.[13]

Entered for the Court

Scott M. Matheson, Jr.
Circuit Judge

---

[13] We grant the motion to file certain exhibits under seal under Tenth Circuit Rule 25.6. *See* Aplt. Doc. 26; Aplee. Doc. 27.